IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2018

**STATE OF TENNESSEE v. ERIC ORLANDO CARTER**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-826     Monte D. Watkins, Judge**

_____

**No. M2017-01466-CCA-R3-CD**

_____

The Defendant, Eric Orlando Carter, was indicted on one count each of first degree premeditated murder, first degree felony murder, and attempted first degree murder. See Tenn. Code Ann. §§ 39-12-101, -13-202. Following a jury trial, the Defendant was convicted of first degree premeditated murder and attempted first degree murder. The jury was unable to reach a verdict on the charge of first degree felony murder. A mistrial was declared on that charge, and it was subsequently dismissed by the State. The trial court then imposed a total effective sentence of life imprisonment. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; and (2) that the trial court erred in denying his motion to dismiss for lack of a speedy trial. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ (on appeal); and Karl E. Pulley (at trial), Nashville, Tennessee, for the appellant, Eric Orlando Carter.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Glenn R. Funk, District Attorney General; and Nathan McGregor and Roger D. Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

In May 2014, the Defendant lived in unit C46 of the Summerwind Apartments in Nashville. The Defendant's apartment was on the bottom floor of the "C Building." On May 6, 2014, Nicholas Edmondson was at "a get-together" in apartment C52 to celebrate the fact that he had recently "got[ten] out" of jail. Unit C52 was above the Defendant's apartment on the third floor of the C Building. Michael Pillow, who also went by the nickname "Beezey," was a friend of Mr. Edmondson's and was also at the party that night.

Mr. Edmondson admitted that he had been drinking alcohol that night and that he was involved in a "verbal altercation" on the breezeway that divided the C Building in half. Mr. Edmondson recalled that he and Mr. Pillow were standing on the breezeway talking in front of a door when "somebody opened up the door and was like, uh, get the f--k from around here with all that loud ass noise." Mr. Edmondson testified that he thought this "was disrespectful," so he asked the man "who the f--k he was talking to."

According to Mr. Edmondson, Mr. Pillow was also involved in this verbal altercation and "some impolite things were said on both sides." Mr. Edmondson testified that he did not know the man they were arguing with. The verbal altercation ended when Mr. Edmondson's friend, "Scooby," "came downstairs and apologized for [them] and said [they] had a party going on, [Mr. Edmondson had] been drinking, [and] pulled [them] upstairs." Mr. Edmondson admitted that the man never threatened them during the verbal altercation.

Approximately "forty-five minutes to [an] hour" later, Mr. Edmondson heard "[s]omething hit the patio door." Mr. Edmondson and Mr. Pillow went outside "to check," and they saw the man from the earlier verbal altercation at the bottom of the breezeway. Mr. Edmondson recalled that the man said, "[W]hy don't y'all b---h asses come down here and fight me now." Mr. Edmondson testified that the man appeared to be alone and unarmed.

Mr. Edmondson and Mr. Pillow decided to go downstairs and fight the man. Mr. Edmondson insisted that he and Mr. Pillow were unarmed. Once they reached the bottom of the breezeway steps, "[t]wo people" emerged from either side of the breezeway and "drew down" on them with "[p]istols." Mr. Edmondson and Mr. Pillow then "immediately turned around" and went back up the breezeway steps. Mr. Edmondson testified that he heard gunfire as "[s]oon as [they] turned around."

Mr. Edmondson and Mr. Pillow made it to the second floor landing where they lay down on the floor. Mr. Edmondson testified that it sounded like "more than one gun" was being fired and estimated that he heard twenty or thirty gunshots. The gunfire stopped and Mr. Edmondson and Mr. Pillow "both lifted up." Mr. Edmondson recalled that "the assault rifle started" when they began to get up. Mr. Edmondson testified that

he knew it was an assault rifle from the sound of the gunfire. Mr. Edmondson estimated that he heard thirty or forty gunshots during the second round of gunfire.

When the second round of gunfire stopped, Mr. Edmondson got up and told Mr. Pillow, "[C]ome on, bro, we gotta go." Mr. Pillow did not move and Mr. Edmondson "pulled him" by his shoulders. Mr. Pillow still did not move. At that point, Mr. Edmondson noticed "the blood [on his] clothes" and "the pool of blood" around Mr. Pillow. Mr. Edmondson testified that he was sure Mr. Pillow was alive prior to the second round of gunfire "[b]ecause [they] both got up."

Mr. Edmondson testified that he then ran back to apartment C52. Mr. Edmondson had not been struck by any of the gunfire. According to Mr. Edmondson, once he was back inside the apartment he was told that he needed to leave. Mr. Edmondson admitted that he did not wait for the police to arrive. Instead, a friend drove Mr. Edmondson to his mother's house.

Mr. Edmondson admitted that he was unable to identify the man involved in the verbal altercation or any of the shooters. Mr. Edmondson also admitted that, at the time of trial, he was in custody for an aggravated robbery that happened after the victim's murder. However, Mr. Edmondson insisted that he had testified truthfully.

Kiara Henderson testified that she was the tenant of apartment C52 and Mr. Pillow's cousin. Ms. Henderson admitted that there were several people at her apartment on the evening of May 6, 2014. According to Ms. Henderson, she and Mr. Pillow had just returned to her apartment from a nearby basketball court when they heard an "altercation." Ms. Henderson testified that she and Mr. Pillow went downstairs and found the Defendant and Mr. Edmondson arguing in front of the breezeway.

According to Ms. Henderson, Mr. Pillow then "got involved in" the altercation. Ms. Henderson admitted that Mr. Edmondson and Mr. Pillow were both intoxicated during the altercation. At one point, Mr. Pillow told the Defendant that "he would take [the Defendant's] gun and kick his ass." Ms. Henderson recalled that she told Mr. Pillow "just to chill because [they] [did not] have [any] guns and [the Defendant] had one." Ms. Henderson testified that no one at her apartment that night had a gun.

Ms. Henderson testified that she "couldn't stop" the altercation, so she went upstairs to "get Scooby." Ms. Henderson recalled that "Scooby" went downstairs and spoke to Mr. Pillow, Mr. Edmondson, and the Defendant. Ms. Henderson also recalled that Mr. Pillow and the Defendant shook hands. According to Ms. Henderson, she returned to her apartment with Mr. Pillow, Mr. Edmondson, and "Scooby."

Ms. Henderson believed that the altercation was over, but about an hour later, she heard "[a] lot" of gunshots. Specifically, Ms. Henderson testified that she heard two rounds of gunfire with a pause in between. After the gunfire stopped, Ms. Henderson "ran outside" and down the breezeway steps where she found Mr. Pillow "on the ground bleeding" on the second floor landing.

Timberly Martin testified that she was Ms. Henderson's mother and had been staying with her in apartment C52 in the weeks prior to the shooting. Ms. Martin also testified that no one at the apartment on the night of May 6, 2014, had a gun. According to Ms. Martin, she had fallen asleep on the living room floor during the party. Ms. Martin explained that she had consumed alcohol, smoked marijuana, and taken medication for "chronic pain and . . . major depression" that put her in a "[h]ard" sleep. Ms. Martin admitted that she did not hear any gunshots while she slept. Instead, the noise from "the opening and closing" of the front door woke her up.

Ms. Martin testified that she "immediately" went outside after she woke up. Ms. Martin recalled that it was smoky outside from the gunfire. Ms. Martin went toward the second floor landing and "slammed into" "Scooby" as he was going back upstairs. Ms. Martin testified that she saw Mr. Pillow, who was her nephew, on the second floor landing. Ms. Martin "checked to see if [Mr. Pillow] was breathing" by "touch[ing] his neck." Mr. Pillow was not breathing and appeared to be dead.

Ms. Martin then went down to the first floor. Ms. Martin testified that she saw the Defendant "standing there like in a GI Joe position pointing a gun . . . towards the breezeway." Ms. Martin explained that the Defendant "was like in a crouch . . . stance" and holding "a long assault rifle." According to Ms. Martin, she and the Defendant stared at each other for a moment and the Defendant began "screaming," "[H]urry the f--k up, come on, come on, hurry up, let's go."

Ms. Martin testified that she approached the Defendant and asked him "what was going on." At that point, Ms. Martin "heard a voice behind [her] saying, '[S]hut up, b---h, before we shoot you too.'" Ms. Martin testified that she turned around and saw the Defendant's brothers, William and Demetrice Carter,[1] standing there. According to Ms. Martin, she then hid under a car where she saw the Defendant drag a screaming "girl" down the sidewalk. Ms. Martin testified that she stayed hidden until she "heard the screeching of . . . tires."

Kevin Smart testified that in May 2014 he lived in apartment D65 with his fiancée, Jessica Hall. Mr. Smart testified that on the night of May 6, 2014, he was sitting in a

---

[1] Because they share a last name, we will refer to the Defendant's brothers by their first names to avoid confusion. No disrespect is intended.

-4-

white van parked in front of the C Building and listening to music. Mr. Smart recalled that he saw a man who appeared to be intoxicated "walking down . . . the center of the . . . parking lot hollering out[,] [']Beezey.[']" Mr. Smart also saw the Defendant walk out of his apartment, wearing just a pair of shorts, and "get his DVD player" out of his car.

Mr. Smart recalled that the Defendant asked the intoxicated man if he "was saying Keezey" instead of "Beezey." Mr. Smart testified that the intoxicated man then "said something smart" to the Defendant. According to Mr. Smart, "one thing led [to] another, and . . . another individual came down" from an apartment on the third floor and joined the intoxicated man. Mr. Smart continued, testifying that the second man "said something and then everything escalated from that point."

Mr. Smart recalled that the Defendant was not "threatening" to the men. Rather, the Defendant "was just standing there . . . listening to" the men. Mr. Smart testified that he heard one of the men threaten to "kick in" the Defendant's door. Mr. Smart also heard one of the men say that he did not care if the Defendant had "a pistol" because he would "take the pistol" and "whip [the Defendant's] ass." However, the men eventually went back upstairs, and the Defendant went back inside his apartment.

A short time later, Mr. Smart saw the Defendant go back outside. Mr. Smart testified that the Defendant "seemed to be upset" and was talking on his cell phone. Mr. Smart then witnessed an SUV, a Dodge Charger, and a "Suzuki truck or something" pull into the parking lot. According to Mr. Smart, the Defendant approached the vehicles and talked to their occupants. Mr. Smart recalled that several men got out of the vehicles and formed "like a huddle" in the parking lot and sidewalk area in front of the C Building.

Mr. Smart estimated that there were five men including the Defendant and that "everybody had weapons." Mr. Smart saw the Defendant with an "assault rifle." The rest of the men had handguns. Mr. Smart recognized two of the men as the Defendant's brothers, William and Demetrice. According to Mr. Smart, the group of men walked up to the door of an apartment on the third floor. However, they did not knock on the door. Instead, the group "walked back down the steps."

Mr. Smart testified that "a couple of minutes later," "one or two" men came out of the third floor apartment and walked down the breezeway steps. Mr. Smart recalled that the Defendant was standing "by his breezeway" while the other men were "out in the parking lot." According to Mr. Smart, "[s]hots rang out" from "multiple guns" when the men from the third floor apartment got to the bottom of the steps. Mr. Smart testified that he saw the Defendant firing an assault rifle, but that he heard "only a couple of shots" from the assault rifle. Mr. Smart further testified that the gunshots were "[a]ll [fired] directly into the breezeway."

Mr. Smart recalled that he ran to apartment D65 once the shooting stopped. Mr. Smart admitted that he did not speak to the police about the shooting until he was arrested several days later on an unrelated warrant. Mr. Smart also admitted that the police initially believed that he was involved in the shooting. However, Mr. Smart insisted that he was in the van "the whole time" and not one of the shooters.

Mr. Smart admitted that he initially told the police that the Defendant was inside during the shooting. However, Mr. Smart testified that this was a lie. Mr. Smart explained that he initially lied to the police because he did not want to be involved in this case or have to testify at trial. Mr. Smart eventually identified the Defendant and his brothers, William and Demetrice, from photographic lineups that the investigators showed him, and Mr. Smart told the investigators that they were three of the shooters. Mr. Smart asserted that he did not have "a deal" with the State and was "still facing [his] own charges." Mr. Smart insisted that his testimony was truthful.

Ms. Hall testified that she went to the parking lot on the night of May 6, 2014, to get a cigarette from Mr. Smart. Ms. Hall recalled that she saw a "[v]ery drunk" man walking in the parking lot "yelling out[,] [']Beezey.[']" According to Ms. Hall, the Defendant was standing at his car when the drunk man approached him and asked "if he knew where Beezey was." Ms. Hall recalled that the Defendant asked the drunk man who he was looking for. The drunk man "said something smart" to the Defendant in response and then walked away. Ms. Hall did not recall the Defendant's saying anything back to the drunk man.

Ms. Hall testified that, later, the drunk man was talking with "a couple of people" in front of the Defendant's door. Ms. Hall recalled that she heard the drunk man say that he would "kick [the Defendant's] ass." Ms. Hall testified that she heard the drunk man say "something about having a gun and he would go in the [Defendant's] house or something like that." However, Ms. Hall did not see the drunk man or any of the people he was talking to with a gun.

Ms. Hall eventually went back to apartment D65. Ms. Hall testified that she was on the balcony of her apartment later that night when she saw an SUV "pull down . . . fast and [back] up beside the trash cans." According to Ms. Hall, the Defendant "walked up to [the SUV] and got [a] gun out of" it. Ms. Hall described the gun as "big" and "[l]ong." At some point, Ms. Hall saw the Defendant's girlfriend come out of their apartment holding a baby and "crying and kinda pleading with him." Ms. Hall eventually went back inside her apartment.

Ms. Hall testified that she went back out on the balcony a short time later. According to Ms. Hall, she saw a total of four men, including the Defendant and one of the Defendant's brothers. Ms. Hall testified that she saw the men "getting in a

formation" and "a bunch of hand gestures," "almost like an Army attack." Ms. Hall recalled that there were two men in front of the breezeway and a man on either side of the breezeway. Ms. Hall testified that all of the men had guns, but that the Defendant was the only one with "a long gun." Ms. Hall went back inside her apartment and then heard "[a] lot" of gunshots.

Ms. Hall admitted that she did not speak to the police until several days after the shooting when she was arrested along with Mr. Smart on "very serious gun and drug charges." Ms. Hall testified that those charges were still pending and that she had not discussed an "end game" for those charges with the State. Ms. Hall acknowledged that Mr. Smart was originally a suspect in this case, but she insisted that she had not lied to protect him. Ms. Hall further insisted that she was truthful when she spoke to the police and testified at trial.

Katie Gardner testified that on the night of May 6, 2014, she went to the Summerwind Apartments with her husband and their three-year-old daughter to check on her mother-in-law. Ms. Gardner recalled that they had parked in front of the D Building and that her husband was taking their daughter out of her car seat when they heard gunshots. The gunshots were "really fast, really loud, [and] all at once." Ms. Gardner's husband got back in their car and began to drive them out of the apartment complex.

As they were leaving, Ms. Gardner saw an SUV and a Dodge Charger in the parking lot. The SUV had its lights on and its doors open while four or five men stood around it. Ms. Gardner testified that she also saw a man, who she identified as the Defendant, "coming down the sidewalk with a big gun with a strap on it walking towards" Ms. Gardner's car. The gun was "[a] long gun," and Ms. Gardner thought it looked like an "AK-47." Ms. Gardner recalled that the Defendant was wearing a tank top and "cargo" pants.

Dan Smith testified that he was the "property maintenance supervisor" for the Summerwind Apartments and lived in the complex. Mr. Smith testified that around 11:45 p.m. on May 6, 2014, he heard "two bursts" of "rapid [gun]fire" with "two single shots" in between the bursts. After hearing the gunshots, Mr. Smith went to the breezeway of the C Building where he saw Mr. Pillow's body on the second floor landing. Mr. Smith saw other tenants "standing around," but he did not see the Defendant or anyone with a gun.

Mr. Smith described the damage done to the C Building as follows: "The bullets that were fired went through two different apartments on each side of the breezeway. There were multiple gunshot holes in the vinyl siding, through windows, through gutters, through walls, [and] through half[-]inch metal plating that the breezeway [was] on." The damage was not limited to the C Building. Mr. Smith testified that the B Building "had a

window [that] was shot or hit with a bullet and shattered." The B Building also had "guttering at the very top," "soffit," and "some shingling" that were "also hit." Mr. Smith estimated that the shooting left a total of forty bullet holes in the two buildings.

Mr. Smith provided the police with a copy of the apartment complex's surveillance video from the night of the shooting. The video footage was played for the jury. The video footage showed a GMC Yukon and a Dodge Charger entering the apartment complex at approximately 11:30 p.m. Ms. Gardner's car entered the complex at approximately 11:45 p.m. Ms. Gardner's car then left the complex at 11:50 p.m. Ms. Gardner's car had to go around the Yukon in order to get out of the complex. One of the investigators described Ms. Gardner's car as traveling "at a high rate of speed" as it exited the complex. The Yukon and the Charger left the complex almost immediately after Ms. Gardner's car had exited the complex.

From the second floor landing where Mr. Pillow's body was found to "the sidewalk or the grassy area . . . across from the C Building" investigators recovered thirty-one 9mm caliber cartridge casings, two .45 caliber cartridge casings, eleven 7.62 x 39mm caliber cartridge casings, and twenty-one projectile fragments. The investigators had to cut out a portion of the drywall in apartment C50 in order to recover one of the projectile fragments.

The investigators also searched the Defendant's apartment, unit C46, during the early morning hours of May 7, 2014. The investigators recovered an empty holster found on a couch in the living room. They also recovered various calibers of ammunition that were found on a table in the living room. Additionally, the investigators recovered two cell phones.

A subsequent forensic evaluation of one of the cell phones, a white Samsung Galaxy Epic, revealed that "a third party application" called "AndroRec" had been "installed on the phone." The AndroRec application recorded the phone calls made and received by the cell phone. The investigators were able to determine which of the recordings had been made immediately prior to the shooting, and those recordings were played for the jury during the trial.

Both Ms. Hall and Mr. Smart testified that they knew the Defendant prior to the shooting and were familiar with his voice. Ms. Hall and Mr. Smart identified the Defendant as making the following statements on the recordings:

- "[I]t's gonna go down, tonight. F--k this s--t. I'm going down."

- "Cuz, come out here real fast, cuz, them n---as talking that bulls--t. I'm gonna burn your ass n---a.

-8-

- "Get your straps, hurry up and come out here, cuz, (unintelligible) talking that bulls--t."

- "Were you coming or not, Daddy?  I need to know you coming or not.  I need to know 'cause I can go an tell Will to get the K and s--t."

- "These n---as just, I went outside to go get my gun and my, my, uh, DVD player, cuz like '[H]ey where the f--k Beez[e]y at?'  I'm like 'N---a, I don't know no mother f--king Beez[e]y.'  And he talking s--t, that's what it was.  They talking, 'You need to go in the house (unintelligible) b---h,' this and that.  So I like, okay, I'll go in the house, okay.  So, is you going to come or not?  I need to know, 'cause I can tell Will to go over and get the K from you, and I can have it here.  I'm not gonna play with these ho ass n---as."

- "Just get Will and them the K so we can handle our business, what I'm saying."

- "What the f--k is wrong with you, n---a?!  I asked you one mother f--king thing, n---a, I said can you come out here and bring me what's mines, n---a, and that was it.  End of discussion.  I ain't need no other answer.  I ain't need none of that bulls--t.  I ain't none of that s--t, 'cause right now I'm going to put a hole in a n---a's head.  I'm not playing.  So either you going to come or not.  Is you gonna come or not, n---a!?  Quit all that talking!  Pull up on me n---a, you know how I am.  Don't play with me, n---a.  Seriously!  Do not play with me!"

Ms. Hall also identified the Defendant on the recordings as saying the following: "Go on get the strap, cuz, call daddy and everybody, cuz, come on out here, cuz.  Alright."; and "(Unintelligible) talking that bulls--t.  Hurry up and bring that K over here, I need it.  Bring it over here fast."  Additionally, Mr. Smart identified the Defendant on the recordings as saying, "Hell no.  I'm about to kill these ho ass n---as, cuz, I ain't bulls--ting.  They got me f--ked up."

On June 5, 2014, the investigators spoke to Maxwell Mavunga about the vehicles seen on the surveillance footage from the Summerwind Apartments.  Mr. Mavunga owned a towing business and was in a romantic relationship with the Defendant's mother.  The next day, June 6, 2014, Mr. Mavunga had a Suzuki Grand Vitara "junked" at the request of the Defendant's brother, William.

On June 7, 2014, Mr. Mavunga led the investigators to a GMC Yukon and gave them permission to seize it.  Mr. Mavunga testified that he had lent the Yukon to the

Defendant's mother prior to the shooting and that she returned it to him following the shooting. Mr. Mavunga admitted that he had been charged as an accessory after the fact for his actions following the shooting.

On July 2, 2014, investigators executed a search warrant at an apartment on Sylvan Street. The girlfriend of the Defendant's brother, William, was the occupant of the apartment. There was paperwork found in the apartment suggesting that William also lived there. During the search, the investigators found a 9mm Glock semiautomatic handgun, a 9mm Taurus semiautomatic handgun, four magazines "from a semiautomatic handgun," and twenty-six rounds of 9mm ammunition. The serial number on the 9mm Taurus was "TRF10943."

Approximately a week prior to the shooting, the Defendant had been pulled over for not wearing a seatbelt. The Defendant told the patrol officer that "he legally possessed a handgun." The patrol officer checked the handgun's serial number and recorded it in his report before returning it to the Defendant. The patrol officer's report revealed that the Defendant's handgun was a 9mm Taurus with the serial number "TRF10943."

Subsequent forensic testing by the Tennessee Bureau of Investigation (TBI) revealed that twelve of the thirty-one 9mm caliber cartridge casings recovered at the crime scene were fired from the Defendant's 9mm Taurus that was recovered during the search of the Sylvan Street apartment. Additionally, ten of the 9mm caliber cartridge casings had been fired from the 9mm Glock that was also recovered during the search of the Sylvan Street apartment. The remaining nine 9mm caliber cartridge casings were fired from the same unknown gun.

TBI forensic testing also revealed that the eleven 7.62 x 39mm caliber cartridge casings had been fired from the same unknown "AK-47 style rifle." Additionally, the two .45 caliber cartridge casings had been fired from the same unknown .45 caliber handgun. The investigators never recovered the third 9mm handgun, the .45 caliber handgun, or the rifle that were used during the shooting.

On July 3, 2014, the Defendant's brother, William, was stopped while driving the Defendant's gold Volvo. A canvas bag found in the car's trunk contained a box of ammunition, six magazines, and a scope. Subsequent forensic testing revealed that the fingerprints of the Defendant's brother, Demetrice, were on the box of ammunition and two Taurus magazines.

Doctor Erin Carney, an expert in forensic pathology, conducted an autopsy of Mr. Pillow's body. Dr. Carney testified that Mr. Pillow was struck by at least seven bullets. Mr. Pillow also had "several lacerations" and abrasions on his face, right arm, fingers,

and legs. According to Dr. Carney, the first bullet struck the right side of Mr. Pillow's jaw. The bullet broke Mr. Pillow's jaw, "hit the right carotid artery," and struck two of his vertebrae. This bullet also caused "tearing on the posterior aspect of [Mr. Pillow's] tongue and his epiglottis." Additionally, the bullet caused "some bleeding on [Mr. Pillow's] brain." Dr. Carney recovered the bullet "from the paraspinal muscles . . . on the left side of [Mr. Pillow's] spine." In addition to this bullet, Dr. Carney collected "several [metal] fragments" from Mr. Pillow's body and clothing.

Dr. Carney testified that the second bullet struck the right side of Mr. Pillow's neck and "exit[ed] on [his upper] back." The third bullet strike resulted in a "tangential" gunshot wound "across the top of [Mr. Pillow's] shoulder." The fourth bullet entered the top of Mr. Pillow's left shoulder, went "through the skin and the subcutaneous tissue and the muscle," and "then exit[ed] the upper back." The fifth bullet entered the back of Mr. Pillow's right arm and exited toward his chest. The sixth bullet entered the palm of Mr. Pillow's right hand, broke "the third metacarpal bones," and exited on "the back of the hand." The seventh bullet struck Mr. Pillow's left hand, traveling "in and out through . . . the meat of [the] hand."

Dr. Carney determined that Mr. Pillow's manner of death was homicide with the cause being "multiple gunshot wounds." Dr. Carney explained that Mr. Pillow died from "significant bleeding and damage to the brain." Dr. Carney was unable to determine the distance between the shooters and Mr. Pillow beyond noting that they were at least more than two or three feet away from Mr. Pillow. Dr. Carney admitted that none of Mr. Pillow's gunshot wounds had the "classic" appearance of a wound caused by "a higher powered gun" such as an assault rifle. However, Dr. Carney also noted that several "things . . . [had] been shot through at the scene and that [could] kind of slow the bullet and [cause the resulting wound to] maybe not have the typical appearance that you'd expect."

Avery Cox testified on the Defendant's behalf at trial. Mr. Cox admitted that, like the Defendant, he had been charged with the murder of Mr. Pillow. Mr. Cox testified that on the night of the shooting he was with the Defendant's brother, Demetrice, and several other people. According to Mr. Cox, the people he was with started receiving phone calls, and the caller "wanted his family to come out" to the Summerwind Apartments. "So everybody . . . put on clothes and got in the truck." Mr. Cox testified that he did not know if the people he left with were armed when they left the house.

According to Mr. Cox, they arrived at the Summerwind Apartments and just "sat in the truck for about a couple of minutes." Mr. Cox testified that the Defendant eventually approached them and told them "about like an altercation that happened with some people that were . . . living inside the apartments." Mr. Cox denied that he planned

to kill anyone that night with either the Defendant or any of the other people he was with. Instead, Mr. Cox testified that he believed he was there to participate in "a fight."

Mr. Cox testified that as the group talked, "[p]eople started getting a little agitated." Mr. Cox admitted that he "started getting a little agitated[,]" too. Mr. Cox claimed that "somewhere down the line [he] was handed a revolver" and "told to hold it." Mr. Cox stated that he put the revolver "in [his] pocket." Mr. Cox testified that he recognized the revolver as belonging to the Defendant's mother.

According to Mr. Cox, the Defendant's father then arrived at the Summerwind Apartments in a Dodge Charger. Mr. Cox recalled that the Defendant's father had a .45 caliber handgun. Mr. Cox testified that the Defendant's father also had "some type of rifle" in the trunk of the Dodge Charger. According to Mr. Cox, the Defendant took the rifle out of the trunk, "looked at it[,] and sat it down against the wall." Mr. Cox testified that "[o]ther guns were brandished" by the rest of the group.

Mr. Cox claimed that "[s]ome guy" came downstairs from a third floor apartment and was "talking back and forth" with the Defendant. According to Mr. Cox, "[i]t got a little heated" between the man and the Defendant, but the man eventually went back upstairs. Mr. Cox admitted that he went upstairs and knocked on the door of the third floor apartment and, later, threw "pebbles" at the apartment in an attempt to get the people in the apartment "to come down and fight."

Mr. Cox claimed that, eventually, three men came out of the third floor apartment and started down the breezeway steps. Mr. Cox admitted that the men could not see that Mr. Cox and the others in the parking lot were armed. Mr. Cox claimed that one of the men put "his hand on [his] hip" and that he thought he saw a gun. Mr. Cox explained that "from what [he had] seen before, . . . you got your hand on your hip, you either got a pistol or something." Mr. Cox testified that everything after that "was like a blur."

Mr. Cox testified that he "heard gunshots" and "bullets passing." Mr. Cox testified that he "guess[ed] [they] were being shot at" by the men in the breezeway. Mr. Cox explained that he "heard bullets passing by [his] head." However, Mr. Cox admitted that he did not see the men in the breezeway point or fire a weapon. Mr. Cox further admitted that none of the people he was with were shot during the incident.

Mr. Cox testified that the Defendant's brothers, William and Demetrice, and the Defendant's father fired their guns. Mr. Cox admitted that he fired his gun "in the air." However, Mr. Cox claimed that the Defendant "hit the ground" after "the first couple of shots" and eventually fled the area of the shooting. Mr. Cox testified that he did not recall seeing the Defendant with a gun or firing a gun during the shooting. Rather, Mr. Cox claimed that a man wearing a long black coat named "Ty," who Mr. Cox believed

lived in the Summerwind Apartments, "ended up grabbing the assault rifle" and firing it at the breezeway.

Mr. Cox testified that after the shooting, everyone in his group left the apartment complex. Mr. Cox specifically recalled the Defendant's leaving with his girlfriend and daughter in the Defendant's father's Dodge Charger. Mr. Cox testified that he saw the assault rifle a few days after the shooting at the Sylvan Street apartment. Mr. Cox recalled that the gun "was on the couch" and "broken . . . apart in pieces."

Based upon the foregoing, the jury convicted the Defendant of the first degree premeditated murder of Mr. Pillow and the attempted first degree murder of Mr. Edmondson. The jury was unable to reach a verdict on the charge of first degree felony murder also regarding the killing of Mr. Pillow. A mistrial was declared on that charge, and the State subsequently dismissed it. Following a sentencing hearing, the trial court imposed a total effective sentence of life imprisonment. The Defendant now appeals to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that the State failed to prove that he acted with premeditation. The Defendant also argues that the State had "not sufficiently rebutted the testimony of [Mr.] Cox" and that Mr. Cox's testimony should have been weighed more heavily than the testimonies of the other witnesses because Mr. Cox "stood to gain nothing" from testifying for the Defendant. The Defendant further argues that the State failed to prove that Mr. Pillow was struck by any of the rounds allegedly fired by the Defendant or that the Defendant "solicited, directed, or aided other people in the commission of the offenses." The State responds that the evidence was sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011).[2] The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of

---

[2] In his brief, the Defendant argues that "when the jury relies on circumstantial evidence in finding premeditation," that evidence must be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." This was the standard of review enunciated by our supreme court in State v. Crawford, 470 S.W.2d 610 (Tenn. 1971). However, our supreme court expressly overruled this standard more than seven years ago in Dorantes, 331 S.W.3d at 370.

premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

As pertinent to our review, criminal attempt is committed when a defendant acts "with the kind of culpability otherwise required for the offense" and "with [the] intent to cause a result that is an element of the offense," and the defendant "believes the conduct will cause the result without further conduct on the [defendant's] part." Tenn. Code Ann. § 39-12-101(a)(2). Additionally, the jury was charged on criminal responsibility for the conduct of another. As charged to the jury, a defendant is criminally responsible for an offense committed by the conduct of another if the defendant "solicits, directs, aids, or attempts to aid another person to commit the offense" while "[a]cting with [the] intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2).

The record belies the Defendant's assertion that the State failed to prove that he acted with premeditation. It was established at trial that the Defendant was involved in a "verbal altercation" with the victims, Mr. Pillow and Mr. Edmondson, on the night of the shooting. Witnesses described the Defendant as being calm during this altercation. Afterwards, the Defendant made several phone calls to his family members. Ms. Hall and Mr. Smart identified the Defendant's voice on the recordings of these phone calls describing the verbal altercation with the victims and saying that it was "gonna go down, tonight"; that they need to "[g]et [their] straps . . . and come out here"; that they needed "to get the K" and bring it to him; and that he was "going to put a hole in a n---a's head." Additionally, Mr. Smart identified the Defendant's voice on the recordings as saying that he was "about to kill these ho ass n---as."

Several members of the Defendant's family arrived at the Summerwind Apartments. In total, there were between three and four armed men with the Defendant. The Defendant was seen taking an assault rifle from one of the vehicles the men had arrived in. The men were seen "getting in a formation" and using "a bunch of hand gestures," "almost like an Army attack." The Defendant then lured the unarmed victims from the third floor apartment with a challenge to fight. There was also testimony that the victims were unaware that the Defendant was armed.

-15-

Once the victims reached the bottom of the steps, the other shooters appeared and opened fired on them. Police later recovered over forty spent cartridge casings from the crime scene, and Mr. Pillow was struck by at least seven bullets. The Defendant was seen after the shooting holding an assault rifle and instructing the other shooters to flee. There was also testimony suggesting that the Defendant and members of his family attempted to destroy evidence of their involvement in the killing. Accordingly, we conclude that there was overwhelming evidence that the Defendant acted with premeditation.

Additionally, we do not find the Defendant's arguments that the State failed to "sufficiently [rebut] the testimony of [Mr.] Cox" and that Mr. Cox's testimony should have been weighed more heavily than the testimonies of the other eyewitnesses to be persuasive. As noted earlier, this court does not reweigh the evidence. See Sheffield, 676 S.W.2d at 547; Cabbage, 571 S.W.2d at 835. Furthermore, questions regarding the credibility of the witnesses and the weight and value to be given to evidence are the province of the jury. See Bland, 958 S.W.2d at 659. Here, the jury chose to accredit the testimonies of numerous other eyewitnesses over that of a co-defendant, and that fact alone "does not cause its verdict to be suspect." State v. Leath, 461 S.W.3d 73, 104 (Tenn. Crim. App. 2013). As such, we will not disturb that determination on appeal.

Finally, the Defendant argues that there was no evidence that Mr. Pillow was struck by a bullet fired by him or that he "solicited, directed, or aided other people in the commission of the offenses." Again, the record belies the Defendant's assertions. Dr. Carney testified that she was unable to determine the caliber of the bullets that struck Mr. Pillow from the gunshot wounds and that none of the wounds had the "classic" appearance of being caused by "a higher powered gun." However, Dr. Carney also noted that several "things . . . [had] been shot through at the scene and that [could] kind of slow the bullet and [cause the resulting wound to] maybe not have the typical appearance that you'd expect."

Nevertheless, there was overwhelming evidence that the Defendant had "solicited, directed, or aided other people in the commission of the offenses." Ms. Hall and Mr. Smart identified the Defendant's voice on the recorded phone calls instructing members of his family to "[g]et [their] straps . . . and come out here" and to "get the K." Just prior to the shooting, the men were seen using "hand gestures" and "getting in a formation." The Defendant lured the unarmed victims out of the third floor apartment. Furthermore, twelve of the thirty-one 9mm caliber cartridge casings recovered at the crime scene had been fired from the Defendant's 9mm Taurus handgun. After the shooting, the Defendant was seen telling the other shooters, "[H]urry the f--k up, come on, come on, hurry up, let's go." Accordingly, we conclude that the evidence was sufficient to sustain

-16-

the Defendant's convictions for the first degree premeditated murder of Mr. Pillow and the attempted first degree murder of Mr. Edmondson.

## II. Speedy Trial

The Defendant contends that the trial court erred in denying his motion to dismiss for lack of a speedy trial. The Defendant argues that he was prejudiced by a delay of just over two years between his initial indictment and the trial in this case because he was incarcerated for the duration of the delay and "the memory of [the] witnesses faded" during the delay, "whether that fact appear[ed] in the record or not." The State responds that the Defendant has waived plenary appellate review of this issue by failing to include in the appellate record a transcript of the trial court's hearing on the Defendant's motion and the trial court's order denying the motion. The State further responds that the delay of approximately two years was not unreasonable given the complexity of the Defendant's case.

The shooting occurred on the night of May 6, 2014. The Defendant and his brothers, William and Demetrice, were initially indicted on August 22, 2014, for the first degree premeditated murder of Mr. Pillow in Indictment #2014-C-2233. The Defendant was then reindicted on November 21, 2014, in Indictment #2014-D-2943. The charge remained the same in the new indictment, but Mr. Cox was added as co-defendant. On December 11, 2014, the State dismissed Indictment #2014-C-2233. On December 19, 2014, the Defendant was reindicted a second time in Indictment #2014-D-3143. Three co-defendants were added to this indictment. Additionally, the Defendant was indicted for the first degree felony murder of Mr. Pillow and the attempted first degree murder of Mr. Edmondson. On January 8, 2015, the State dismissed Indictment #2014-D-2943.

The State proceeded to trial on Indictment #2014-D-3143 in March 2016. The jury was unable to reach a verdict on the charges in Indictment #2014-D-3143, and the trial court declared a mistrial on March 11, 2016. The State then reindicted the Defendant a third time on May 27, 2016, in Indictment #2016-B-826. This indictment listed just the Defendant's father as a co-defendant and charged them with first degree premeditated murder, first degree felony murder, and attempted first degree murder. Indictment #2014-D-3143 was dismissed by the State on September 30, 2016. On September 29, 2016, the Defendant filed a motion to dismiss Indictment #2016-B-826 for lack of a speedy trial. The Defendant's motion to dismiss was included in the appellate record as was a minute entry from September 30, 2016, noting that the motion was denied. However, neither a transcript of that hearing nor the trial court's order denying the motion were included in the appellate record. The Defendant's trial was then held from October 3-7, 2016.

We agree with the State that the Defendant has waived plenary review of this issue. It is the appellant's "duty to prepare a record which conveys a fair, accurate[,] and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Here, the appellate record does not contain the trial court's ruling on the Defendant's motion to dismiss. As such, we review this issue solely for plain error.

The doctrine of plain error applies when all five of the following factors have been established:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). A defendant's failure to establish any of these criteria requires denial of relief under the plain error doctrine, and "an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Id. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

Here, the Defendant has failed to show that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. Once the State initiates criminal proceedings, the right to a speedy trial is implicated pursuant to the Sixth Amendment to the United States Constitution and to article I, section 9 of the Tennessee Constitution. See Tenn. Code Ann. § 40-14-101; Tenn. R. Crim. P. 48(b). In Barker v. Wingo, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine speedy trial issues and identified the following factors for consideration: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of this right to a speedy trial; and (4) the prejudice to the defendant. See also State v. Bishop, 493 S.W.2d 81, 84-85 (Tenn. 1973) (implicitly adopting the Barker balancing test for our State's constitutional and statutory right to a speedy trial).

Generally, "a delay must approach one year to trigger the [Barker] analysis," although "the line of demarcation depends on the nature of the case." State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997); see Doggett v. United States, 505 U.S. 647, 652 n.1 (1992). However, the reasonableness of the length of the delay depends "upon the peculiar circumstances of each case" and the delay "that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." State v. Easterly, 77 S.W.3d 226, 235 (Tenn. Crim. App. 2001) (citing Barker, 407 U.S. at 530-

-18-

31).  Here, the delay of just over two years would be enough to trigger an analysis of the Barker factors.  Additionally, the Defendant did assert his right to a speedy trial although his motion to dismiss was filed after his first trial and just days before his retrial.  However, there was no evidence that the delay was intentionally caused by the State.  Furthermore, the Defendant has failed to present any evidence that he was prejudiced by the delay other than his conclusory assertion that the delay affected the memories of the witnesses, "whether that fact appear[ed] in the record or not."

More importantly, this was an extremely complex case.  The Defendant's trial took place over five days and included twenty witnesses and seventy-seven exhibits.  Additionally, there were multiple co-defendants implicated in the shooting.  Moreover, the Defendant's previous trial on two of these charges had resulted in a mistrial.  Given the complexity of this case, the Defendant was not denied his right to a speedy trial as the delay of just over two years was not unreasonable.  See Doggett, 505 U.S. at 653 (delay of six years); State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001) (delay of twenty-three months); State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996) (delay of thirteen years); Easterly, 77 S.W.3d at 236 (delay of twenty months).  Accordingly, we conclude that the Defendant has failed to establish plain error regarding this issue.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-19-